Charles SIMS, Appellee,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Appellant.

In re TLC HOSPITALS INC., Debtor.

No. C 98–564 CRB.

United States District Court, N.D. California.

June 18, 1998.

Timothy W. Hoffman, Abbey, Weitzenberg, Kelly, Nadler, Hoffman & Emery, Santa Rosa, CA, for Charles Sims.

Victoria E. Young, Assistant U.S. Attorney, U.S. Attorney's Office, San Francisco, CA, for United States Dept. of HHS.

### ORDER

BREYER, District Judge.

The United States Department of Health and Human Services ("HHS"), which through its component, the Health Care Financing Administration ("HCFA"), operates the Federal Health Insurance for the Aged and Disabled program (hereinafter "Medicare"), appeals from a portion of the bankruptcy court's judgment. The bankruptcy court precluded HHS from applying the doctrine of recoupment to recover outstanding pre-bankruptcy petition overpayments to the debtor from post-petition underpayments to the same debtor. Having carefully read and considered the papers submitted by the parties, and having heard oral argument on Friday, June 12, 1998, the Court REVERSES the bankruptcy court's order on this issue and REMANDS this case for further action consistent with this decision.

### I. STANDARD OF REVIEW

The parties dispute the applicable standard of review for the bankruptcy court's recoupment decision. Appellant argues that a de novo standard should apply while appel-

lee contends that an abuse of discretion review is appropriate. The Court finds that this case is reviewed under the de novo standard because no factual dispute exists; the bankruptcy court merely applied the undisputed facts of this action to the law concerning equitable recoupment. Thus, the appropriate standard of review of the bankruptcy court's decision is de novo. *See Biggs v. Stovin (In re Luz International, Ltd.)*, 219 B.R. 837, 840 (9th Cir. BAP 1998) (applying de novo review in a setoff case because "when the facts are established and the rule of law is undisputed, whether the facts satisfy the legal rule is a mixed question of law and fact"); *see also Newbery Corp. v. Fireman's Fund Insurance Co.*, 95 F.3d 1392, 1398 (9th Cir.1996) (applying de novo standard to review court's summary judgment award in recoupment action).

## II.   STATEMENT OF FACTS

The parties do not dispute the facts of this case. The debtor is a defunct Medicare provider which operated three separate skilled nursing facilities ("Heart of Napa," "Heart of Sonoma," and "Heart of Santa Clara"). Each facility had a separate Medicare agreement with HHS. On June 17, 1994, the debtor filed for bankruptcy under Chapter 11 but the debtor continued to operate for a time after filing its Chapter 11 petition and before conversion to Chapter 7 bankruptcy. At the time it filed its Chapter 11 petition, HHS had overpaid the debtor by $112,061.00 in Medicare payments and HHS owed the debtor's estate $68,871.16 relating to pre-petition services and $46,952.84 relating to post-petition services; the overpayments and underpayments related to different fiscal periods.[1]

The bankruptcy court held that HHS could "setoff its pre-petition overpayments against all pre-petition claims of the debtor, even though the claims may be on account of separate facilities and/or separate fiscal periods." Memorandum of Decision at 2. The bankruptcy court, however, rejected HHS's argument that the doctrine of recoupment

allowed it to setoff the pre-petition overpayments against its post-petition obligations. It held that the recoupment doctrine "is not applicable because the debts are from different fiscal periods and are therefore not part of the same transaction." *Id.* (*citing University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1080 (3d Cir.1992)). The Court also noted that "the ability to recoup across the petition boundary is questionable." *Id.* (*citing In re California Canners and Growers*, 62 B.R. 18, 21 (9th Cir. BAP 1986)).

HHS appealed the recoupment portion of the bankruptcy court's ruling to this Court, contending that the doctrine of recoupment should apply to allow recoupment of pre-petition overpayments against post-petition obligations. The parties have stipulated that, post-petition, HHS has underpaid the Heart of Napa by $5,340.28 and underpaid the Heart of Sonoma by $12,274.24. Accordingly, HHS seeks to apply the doctrine of recoupment and avoid the payment of these amounts to the debtor's estate.

## III.   LEGAL ANALYSIS

HHS asks this Court to apply the doctrine of recoupment to avoid the imposition of the automatic stay to the recovery of money owed by the debtor through the withholding of post-petition reimbursement. The Medicare regulations define the equitable doctrine of recoupment as "the recovery by Medicare of any outstanding Medicare debt by reducing present or future Medicare payments and applying the amount withheld to the indebtedness." 42 C.F.R. § 405.370 (1998). In general, application of recoupment is consistent with the Medicare statute requiring that HHS "periodically determine the amount which should be paid under this part to each provider of services" and then make the "necessary adjustments on account of previously made overpayments or underpayments." 42 U.S.C. § 1395g(a). On its face, however, the doctrine does conflict with the

---

1.   In *United States v. Consumer Health Services of America, Inc.*, 108 F.3d 390, 392–393 (D.C.Cir. 1997), the court provided a detailed explanation of the Medicare reimbursement process. *See*

*also University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1069–70 (3d Cir.1992).

automatic stay imposed by the Bankruptcy Code. *See* 11 U.S.C. § 362(a).

Recoupment is generally defined as "the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *University Medical Center*, 973 F.2d at 1079 (*quoting* 4 *Collier on Bankruptcy* § 553.03, at 553–15–17 (15th ed.1992)). This doctrine stems from the premise that "where the creditor's claim against the debtor arises from the *same transaction* as the debtor's claim, it is essentially a defense to the debtor's claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable." *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984) (emphasis added); *see also Reiter v. Cooper*, 507 U.S. 258, 265 n. 2, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (holding that recoupment "permits a determination of the just and proper liability on the main issue, and involves no element of preference") (quotations omitted).

Application of the doctrine of recoupment centers upon whether the debtor's and the creditor's respective claims arise out of the same "transaction," and "what exactly characterizes a 'transaction' is not readily apparent from the caselaw." *See United States v. Consumer Health Services of America, Inc.*, 108 F.3d 390, 395 (D.C.Cir.1997). HHS argues that in this situation recoupment is required by the Medicare statute and that such action is fully consistent with the doctrine's equitable considerations. The bankruptcy court disagreed, refusing to apply the recoupment doctrine because it found that the overpayment and underpayment did not arise from the same transaction. Memorandum of Decision at 2. Underpayments from HHS to the debtor occurred in 1994 and the overpayments resulting in those debts arose in 1993.

The application of the doctrine of recoupment to Medicare payments has generated a divergence of opinion in courts which have examined the matter. The bankruptcy court in this case relied on the recoupment analysis set forth in *University Medical Center*, 973 F.2d at 1080. There, the Third Circuit held

that debts arising in different fiscal periods are not part of the same transaction for recoupment purposes. *Id.* The court began its discussion by summarizing the Bankruptcy Code's "automatic stay" provision. *See* 11 U.S.C. § 362(a). The automatic stay, which applies to "governmental units," such as HHS, "is designed to replace the 'unfair race to the courthouse' with orderly liquidation that treats all creditors equally." *University Medical Center*, 973 F.2d at 1074 (*quoting United States v. Nicolet, Inc.*, 857 F.2d 202, 207 (3d Cir.1988)). The court held that despite the continuing relationship between the government and the Medicare provider, "a single integrated transaction" cannot stretch over a period of years for purposes of avoiding the automatic stay. *Id.* at 1081. The Third Circuit stated that because recoupment is an equitable standard, "both debts must arise out of a single integrated transaction, so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *Id.*

The *University Medical Center* court stressed that the nature of the billing relationship, which operates on an annual reconciliation process, demonstrated that no single transaction existed. *Id.* at 1080–82. It explained that any monthly pre-petition payments applied to cover both that month's services and any prior overpayment that required adjustment. The court, however, held that the payment could not be construed as an advance for future service. Accordingly, the provider's "post-petition services were the beginning of transactions that would stretch into the future, but they were not part of the [pre-petition] transactions." *Id.* at 1081–82.

A number of courts have adopted a contrary position. In *Consumer Health Services*, the District of Columbia Circuit allowed recoupment in a case identical to *University Medical Center*. *See* 108 F.3d at 394–96. The District of Columbia Circuit held that: (1) the language of section 1395g(a) dictated that liability is determined by "necessary" adjustments for the as-yet-unremitted overpayments; and (2) under a recoupment analysis, "Congress rather

clearly indicated that it wanted a provider's stream of services to be considered one transaction for purposes of any claim the government would have against the provider." *Id.* at 394–95. Accordingly, the court held that the automatic stay did not apply and that the government could recoup the money owed to it through post-petition underpayments to the debtor. *See also In re Southern Institute for Treatment and Evaluation, Inc.,* 217 B.R. 962, 966 (Bankr. S.D.Fla.1998) (citing *Consumer Health Services* and reaching the same result); *In re Heffernan Memorial Hospital District,* 192 B.R. 228, 230–31 (Bankr.S.D.Cal.1996) (explicitly disagreeing with *University Medical Center* in allowing recoupment from Medicare provider).

The Ninth Circuit has not addressed the precise issue before this Court. It has, however, examined the single transaction issue as it related to a breach of contract action involving a bankrupt debtor. *See Newbery Corp. v. Fireman's Fund Insurance Co.,* 95 F.3d 1392, 1403 (9th Cir.1996). In *Newbery,* the court concurred with *University Medical Center's* statement that recoupment should be applied to bankruptcy cases only when it would "be inequitable for the debtor to enjoy the benefits of that transaction without meeting its obligations." *Id.* The court, however, also expressed approval of the district court's application of the less stringent "logical relationship" test for the single transaction analysis. The Supreme Court articulated this standard in *Moore v. New York Cotton Exchange,* 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926). There, the Court stated that " '[t]ransaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." 270 U.S. at 610, 46 S.Ct. 367. Although the Ninth Circuit used the more flexible "logical relationship" standard rather than the "single integrated transaction" test advanced by *University Medical Center,* it did not squarely address the circumstances or facts now before this Court. *See Newbery,* at 1403. Thus, the application of the single transaction standard as it applies to recoupment from a

Medicare provider remains an unsettled question in the Ninth Circuit.

■ For a number of reasons, this Court holds that the decision articulated by *Consumer Health Services* is the correct analysis. Initially, the Court concurs with the District of Columbia Circuit's conclusion that the Medicare statutory provision commands the government to account for prior overpayments through subsequent underpayments. As that court noted, "the amount actually due under the statute is the amount which 'shall be paid'—which includes 'necessary adjustments for prior overpayments.' " *Consumer Health Services,* 108 F.3d at 394 (*quoting* 42 U.S.C. § 1395g(a)). Here, as in *Consumer Health Services,* the "amount due" is the amount owed by HHS for "post-petition services rendered, less the 'necessary' adjustment for the as-yet-unremitted overpayments." *Id.* As the D.C. Circuit stated:

> To conclude otherwise, we think, would allow the Bankruptcy Code to modify an explicit statutory scheme defining liability for particular services. Neither the trustee, the bankruptcy court, nor the Third Circuit in *In re University Medical Center* has offered authority for the proposition that the Bankruptcy Code can act to override an explicit statutory limitation on what the government owes for a particular service. That the limitation in question is defined by the amount the government has previously (over)paid to the provider does not, in our view, alter the analysis.

*Id.* at 394–95.

Debtor contends that this statutory analysis is incorrect in light of the Third Circuit's holding in *Lee v. Schweiker,* 739 F.2d 870, 876 (3d Cir.1984). In *Lee,* the debtor, a social security recipient, received an overpayment of benefits prior to her filing for Chapter 13 bankruptcy. Post-petition, the Social Security Agency attempted to offset future payments against the overpayments and reduced her monthly payments accordingly; the debtor sued to recover the amounts deducted. The Third Circuit rejected the government's argument that its statutory right to setoff against future payments could defeat the Bankruptcy Code's protections over a debtor's post-petition income. *Id.* It also

held that the government's ability to recover a pre-petition debt was limited by the restrictions placed on setoffs by 11 U.S.C. § 553(a). *Id.*

The holding in *Lee* is inapposite to this case. Put simply, *Lee* involved the protection of an individual whom the Social Security Act sought to assist: the Social Security beneficiary. Accordingly, that decision reconciled the goals of both the bankruptcy and social security provisions, i.e., to protect a beneficiary's continued Social Security payments. Conversely, HHS's attempt to recoup overpayments from a Medicare provided is not directed at a Medicare beneficiary. As courts have consistently noted, "[w]e do not find in the statute authorizing Medicare and Medicaid any legislative intention to provide financial assistance to providers of care for their own benefit. Rather, the statute is designed to aid the patients and clients of such facilities." *Green v. Cashman,* 605 F.2d 945, 946 (6th Cir.1979); *see also Northlake Community Hospital v. United States,* 654 F.2d 1234, 1242 (7th Cir.1981) (same). Further, HHS determined the post-petition underpayments after the debtor had ceased providing medical services. Thus, application of such recovery by HHS has no effect upon the debtor's ability to serve Medicare beneficiaries. To the contrary, the only effect of a court's refusal to allow recoupment would be to increase the amount of money paid into the estate for the benefit of the creditors. Unlike in *Lee,* this Court's decision to allow HHS to make post-petition underpayments has no effect upon the statutory program or that program's beneficiaries. Thus, the Court holds that in this case there are no considerations counter to the statutory dictates that the government be allowed to recover through post-petition underpayments.

In *Consumer Health Services,* the court also stated that the statutory analysis was "closely related" to an analysis of the equitable recoupment doctrine. 108 F.3d at 394. This Court also agrees with that conclusion. As noted above, recoupment analysis hinges upon the definition of "transaction" as it relates to the relationship between Medicare and a provider. *See id.* at 395; *see also In re*

*The Southern Institute for Treatment and Evaluation, Inc.,* 217 B.R. at 962. In *University Medical Center,* the court departed from the traditional standard by holding that "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." 973 F.2d at 1081. The court justified this new theory by stating that "[u]se of this stricter standard for delineating the bounds of a transaction in the context of recoupment is in accord with the principle that this doctrine, as a non-statutory, equitable exception to the automatic stay, should be narrowly construed." *Id.* As noted above, the Third Circuit held that the annual audit period is the "transaction" for recoupment purposes under Medicare. *Id.* at 1081–82.

This standard is a significant departure from the previously employed definition of "transaction." The *University Medical Center* court used this "circumscribed" definition for the purposes of recoupment in lieu of the established "logical relationship" standard used by the courts in prior decisions. *Id.* (*citing Lee,* 739 F.2d at 875). In so doing, the court moved away from established jurisprudence on the definition of a single transaction. *See* Elizabeth Swinton Schoen & Samuel R. Maizel, *The Medicare Contract in Bankruptcy: In Which Direction Does University Medical Center Lead?,* 11 Bankr. Devs. J. 405, 420–27 (1995) (providing a history of the federal courts' single transaction analysis). Further, the doctrine of recoupment and the definition of transaction are longstanding equitable principles, yet the Third Circuit failed to provide any rationale for its decision to abandon the accepted "logical relationship" standard for its more stringent construction. *See In re Monongahela Rye Liquors, Inc.,* 141 F.2d 864, 869 (3d Cir.1944) (*citing Bull v. United States,* 295 U.S. 247, 261, 55 S.Ct. 695, 79 L.Ed. 1421 (1935) for a discussion of the right of recoupment). In short, *University Medical Center's* stricter standard appears to conflict with any previous interpretation of the definition of a "single transaction" for recoupment purposes.

■ In *Newbery,* the Ninth Circuit quoted *University Medical Center* concerning the equitable application of recoupment, but did not utilize the more stringent transaction test articulated by the Third Circuit. Instead, it affirmed the district court's application of the "logical relationship" test. *See Newbery,* 95 F.3d at 1403. The Court construes this holding not as a wholesale adoption of the stringent *University Medical Center* test, but instead, as a reiteration of the importance of applying the recoupment doctrine in an equitable manner. Thus, in light of both the copious case law in support of the traditional standard and the Ninth Circuit's approval of the "logical relationship" test in *Newbery,* the Court holds that the less stringent standard for defining transaction is the appropriate one.

Applying such a standard, the Court has little difficulty holding that the payments at issue constituted a single transaction. In general, Congress enacted Medicare to provide health insurance benefits to aged and disabled persons. Medicare Part A provides coverage for the costs of hospital and related-hospital services, including the skilled nursing facility services provided here. The efficient functioning of Medicare is premised on the periodic payment of services on an estimated basis prior to a calculation of the exact amount of reimbursement due. *See* 42 C.F.R. §§ 413.60, 413.64 (1998). These payments are made not less often than monthly and are paid by a "fiscal intermediary" designated by the Secretary of HHS. As noted, the Medicare statute requires that ongoing interim payments due to a provider "shall" be "netted" of any overpayments and underpayments. *See* 42 U.S.C. § 1395g(a). In addition, no money is actually owed to the provider for services until the provider has submitted a cost report for the fiscal period, and the intermediary accounts for the costs that were actually incurred and settles the actual amount due. *See id.;* 42 C.F.R. §§ 413.20, 413.60 & 413.64(a) (1998). Only then does the fiscal intermediary determine whether Medicare or the provider is owed money based on the difference between the actual interim payments paid to the provider and the amount determined to be due for each cost reporting period. *See* 42 C.F.R.

§§ 413.9(b)(1) & 413.64(f) (1994); *see also* 42 C.F.R. § 405.1803 (1994). In light of these protracted billing procedures governing the on-going relationship between Medicare and its providers, it is clear that the payments at issue "logically relate" to one another; while this exchange of funds may stretch over an extended period of time, it remains part of a continuous balancing process between the parties.

Other courts have concurred with this decision in holding that recoupment under a Medicare provider agreement is not subject to the automatic stay in bankruptcy. In *Consumer Health Services,* the D.C. Circuit, held that:

> Since it requires the Secretary to take into account pre-petition overpayments in order to calculate a post-petition claim—as we have described above—Congress rather clearly indicated that it wanted a provider's stream of services to be considered one transaction for purposes of any claim the government would have against the provider.

108 F.3d at 395; *see also In re The Southern Institute for Treatment and Evaluation, Inc.,* 217 B.R. at 966 (holding that recoupment is not subject to the automatic stay). This interim payment procedure is based upon the continuing legal relationship between the provider and the program. The flexible schedule permits providers to receive payment prior to the government's lengthy audit procedure. Rather than delineate one transaction from another, the process merely reflects the realities of the complexity of the Medicare program. *See Visiting Nurse Assoc. of Tampa Bay, Inc. v. Sullivan (In re Visiting Nurse Assoc. of Tampa Bay, Inc.),* 121 B.R. 114, 118–119 (Bankr.M.D.Fla.1990) (holding that while an exemption from the automatic stay "may appear to run against the grain of bankruptcy policy, one must recognize the Medicare system is a phenomenally regulated industry.").

Furthermore, related precedent supports the conclusion that the scope of the transaction extends both beyond the fiscal year in which the claims accrued and the normal "cleavage" of the bankruptcy petition. In its

order in this case, the bankruptcy court cited *In re California Canners,* 62 B.R. 18, 21 (9th Cir. BAP 1986), for the proposition that "the ability to recoup across the petition boundary is questionable." In *California Canners,* the court refused to allow recoupment because "[t]he goods in California Canners' post-petition invoice are not the same goods as in Military Distributor's pre-petition invoices." *Id.* at 20. In applying that holding to the facts at issue, the bankruptcy court ignored the equitable nature of recoupment. Unlike the scenario in *California Canners,* the Medicare provisions do not contemplate the exchange of goods subject to a billing invoice. Instead, the program involves a continuing relationship between the provider and the program. The government seeks to recoup money paid prior to the filing of the petition by virtue of the continuing relationship after the post-petition; Courts have uniformly approved of such a practice. *See Holford v. Powers (In re Holford),* 896 F.2d 176, 178 (5th Cir.1990) (allowing recoupment of loss caused by fraud in the inducement of a lease through underpayment of rent due under the lease); *See Ashland Petroleum Co. v. Appel (In re B & L Oil Co.),* 782 F.2d 155, 158–59 (10th Cir.1986) (allowing party to recoup overpayments on oil contract by withholding money owed for purchases that the creditor made from the debtor after bankruptcy). In short, HHS's attempt to recoup through post-petition underpayments is wholly consistent with both established bankruptcy law and the procedural requirements of the Medicare program.

Finally, the equitable considerations presented by the aims of the Medicare program persuade the Court that the government must be allowed to recoup the money through post-petition underpayments. As noted above, the primary effect of barring recoupment where the provider has ceased operations would be the payment of that money into the estate for the benefit of the creditors. This result would only serve to remove money from the Medicare trust fund, despite the fact that the provider unquestionably owed such funds to the government. Should Congress wish to achieve this result, it certainly may do so by changing the Medicare statute. Absent such direction, however-

er, the Court finds that Medicare is best served by allowing HCFA to recoup from post-petition underpayments.

The Court also believes that allowing such a result is consistent with the goals of the Bankruptcy Code. Recoupment "permits a determination of the just and proper liability on the main issue, and involves no element of preference." *Reiter v. Cooper,* 507 U.S. 258, 265 n. 2, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (quotations omitted). Affording HCFA the right to recoup would actually provide the debtor with "a greater right to payment under a contract than it had prior to the bankruptcy filing. Before the filing a debtor only has rights to payment subject to recoupment. Yet ... the denial of recoupment increases a debtor's rights." Schoen, 11 *Bankr.Devs. J.* at 426. Debtor has presented the Court with no justification to sanction such a result.

*CONCLUSION*

In light of the above, the Court holds that the bankruptcy court erred in granting summary judgment for the debtor on the issue of recoupment of pre-petition overpayments from post-petition underpayments. Accordingly, that decision is reversed and this action is remanded to the bankruptcy court for proceedings consistent with this opinion.

**IT IS SO ORDERED.**